Your Honor, I'll start with my argument with regard to Count 2 of the indictment that charged Mr. Allouche with making a false statement on his application, his N-400 form applying for naturalization. In Exhibit No. 14 is the actual form where Mr. Allouche applied and in the X'd out box on Part 2 he said, I've been a lawful permanent resident of the United States for five years. In writing on that form the Immigration Service changed his application at the top to a 319, which is having to do with him being married to a U.S. citizen and living with her for three years. But he truthfully answered on the form he was a lawful permanent resident for five years. During the course of this trial, I asked the court to instruct the jury on the fact that Mr. Allouche was entitled to citizenship under this five-year provision, because one of the elements of a false statement on an N-400 naturalization form is that my client cannot be entitled to citizenship and must know he's not entitled to citizenship. However, facts proved at the trial established that he was entitled to citizenship under the five-year provision under which he applied on the form, that he was an interpreter for the United States government in Iraq during this period, and he was under contract with the U.S. government to do that through a subcontractor, GLS. Ms. Hoare, wasn't there testimony, this is a legal question, but wasn't there testimony from one of the immigration officials that his service overseas in that role would not have been effective continuation of his residency? I don't think you agree with that, but wasn't there evidence to that effect? There was testimony from Immigration Service that it would not affect his application under 319, the married provision, not the residence provision under 316. So there was testimony that it was irrelevant to Section 319. But for your theory to work, wouldn't he have to satisfy all the requirements of 316? Yes, Your Honor, and we did. We filled out the 470 form and were approved, and so we were both under 8 U.S.C. 1427, which is called Section 316 in INS vernacular. He was relieved of the requirement of physical presence in the United States because the exception applied to him, that is, persons who are employed under contract with the government of the United States. But then the jury found that he lied about being married to his wife, so he still didn't comply with all the requirements of 316, even if... Your Honor, unfortunately, I would suggest to the Court that, first of all, there was an intent issue. I think all the testimony was that everyone, including himself and his wife, thought so long as they were married and the divorce was not final before he became a citizen, that he was lawfully married under the provisions and requirements of I.N. Leslaw. Both the wife accompanied him to the interview and helped him and was present. The form actually says wife was present during the interview when they're talking about their marital status, and she testified that she helped him with that, going to the I.N.S. one time at 3281 of the record, and her father, his father-in-law, also went to that interview to assist. So he, and there's e-mails back and forth between the wife and he, right before he's granted citizenship, that we need to the divorce was final at 3282. So all of them had no intent to indicate anything other than the truth with regard to the marriage, and that's all the evidence from the government witnesses and from our position, but... So are you arguing sufficiency of the evidence that the jury improperly found intent? Yes, Your Honor, yes. But I think also that the all of that, because let's say that they had the instruction I asked for at 1334 of the record, that he could preserve his residence for naturalization purposes under 470, and that he could be lawfully admitted for permanent residence under this five-year requirement, and he was a translator for the military. If the jury had before it that option to consider whether or not he was entitled under that, then it could have decided if that statement about marriage would have been something that imputed his moral character and fitness, but it didn't have that instruction in front of them. So the jury was not given sufficient instructions to adequately decide. Instead, the decision is made by counsel making an argument in the briefs about that, but the jury didn't have before it the decision, well, if we look at the five-year residency requirement, does he have sufficient moral character for me to say, okay, he qualified under this? It just simply wasn't before them given the state of the jury instructions on count two. On count three... Yes, Your Honor. Part of what concerns me about the government's argument, but yours as well, we're talking about things, as you just said at the end, that were not given to the jury, the issue of whether he was eligible for naturalization. Good moral character is being argued by the appellant, by the government, as a reason why we don't even need to deal with some of what you're talking about. Is it fair, as the government is saying, that we can look at this independently, without it being given to the jury, of whether he was eligible for naturalization on issues that were not part of the indictment and were not part of what was instructions to the jury? Well, Your Honor, you can because one of the elements is that the government had the obligation to prove that he was not entitled to naturalization under any theory, and that heightened requirement is recognized in the Kinggis case by the U.S. Supreme Court, cited in my brief, and also implicates sentencing because, in addition, I asked that be submitted to the jury because I told the court, you can't, at sentencing, denaturalize him unless the jury also makes this heightened materiality requirement required for denaturalization. So I think that it was all there, that it's required in the elements, that the government prove he was not entitled to naturalization, that's prong two of the 1425 instructions, and it just didn't do that, and that matter wasn't placed squarely before the jury because my jury instruction that went down to the particulars about how he was entitled to naturalization, the jury deciding whether or not he was, wasn't fully presented to them. On count three, we have a sort of similar argument, and that is the grand jury indictment charged my client with making a false statement on a questionnaire for security position. Have you ever been, participated in militias or paramilitary groups, including state government militias? And he answered no, and it says when in truth and in fact, he was a fighter and commander in the militia in the early 80s, and the government agreed with me when we were litigating pretrial whether there were surplusage in the indictment. I did not allege this was surplusage, but the government gratuitously in its response to my motion said this information about when in truth and in fact he was a fighter and commander in a mall in Lebanon in the 80s is highly relevant to the government proving its case and putting the defendant on notice as to the falsehood he will be charged with. Thus, this information is not surplusage. Again, I didn't claim it was surplusage in my motion, but it answered that as well, and they're right. It does put the defendant on notice as to what the falsity was, and they're deliberating for two days on the second day at 10.35 a.m., and the jury asks in count three, is the question, have you ever participated, the actual charge, along with his answer of no. Does that include the when in truth language of count three? Is when in truth part of the indictment or just statements? The court proposed to tell them read the jury charge in paragraph 12 that did not include that particular language, just the elemental charge given in the pattern jury instructions, and I objected saying please tell them the government must prove what's in the indictment because that informs us of what that false statement is. It tells us what the grand jury indicted us for, and instead the court overruled my objection and charged the jury, read the pattern instructions and the jury charge at pages 10 through 12. One hour later, roughly, because it was about an hour and a, less than an hour and a half, and if we account as arguing about what should be read to the jury after we've received their note, having them in and discussing that with them, roughly an hour and a half later. I think that's a proper response to the jury note. Well, there's always the danger trial judges worry about of embellishing on their own, you know, things that are before the jury, and so trying to answer a question without saying too much, you know, that kind of thing. So if the judge says, you know, read the jury instruction, which the jury instruction encompasses, you know, the elements, et cetera, why isn't that a response to the question rather than . . . It doesn't go into what was in the indictment, Judge, and that was the second . . . The elements don't . . . I mean, the jury charge does not instruct the jury with respect to what they have to prove vis-à-vis the accounts that are charged? Well, I requested that the jury be instructed that the government must prove what's in the indictment, and that's where that additional language was, and by answering, just read your jury charge that didn't have that specific characterization of the false statement, what the court did by answering the question that way was constructively amending the indictment to say, well, you can really go on any theory, not just the one in the indictment, and here the government actually argued, well, it's not just if he's a commander in a mall at 4285, if you believe he was carrying water to help them, you can convict them of this. And so, you know, we had not only the answer to the note making it broader, like in the Nunez case where the offense was assault with a firearm, and the judge instructed, well, you can also find an assault by other means, a more broad means. Well, not answering that you need to prove what was . . . I'm sorry, hold the government to proof of what's in the indictment allowed the jury to broaden it to, well, if he was carrying water, not if he was a leader or a commander in a mall, we can find him guilty if there was much less conduct. Substantially broadening the offense and leading to this constructive amendment that leads to the requirement this court reversed the conviction on count three without any showing of prejudice because of the constructive amendment. And the government's argument about carrying water with regard to count three is at page 4285. Finally, I'll briefly mention, Your Honor, that excluding the expert witness and allowing Mr. Holman to testify about matters to which I was not noticed, these were the only on-the-ground witnesses in Beirut during the relevant period of time during the 80s. Mr. Holman, who never entered Beirut but was preparing to deploy there, was called by the government after I was noticed he would just be an expert on immigration, and he was an expert on immigration and testified to that. And then they expanded his testimony to these photos showing what fighters in Lebanon looked like, allegedly, during the 80s, how they dressed, and what tactics the enemy used. It was at this time when I was surprised. I said, This person has not been qualified as an expert to these matters. I object to his testimony. The court allowed it and then disallowed Mr. Davis' testimony. He was a troop on the ground in Beirut, did deploy. I don't think it's in the record that he was a CIA operative. But I made an offer of proof at the bench and then a SEPA offer of proof as well that I've asked this court to abate the appeal and have processed. But at the bench, I indicated this person's going to testify now that Holman surprised me about how these fighters look, what weapons they use, and what tactics they deploy. The same testimony that Mr. Holman surprised me with. And he testified what they used, what they'd shoot out of open windows, they'd run around the corner, and how they would be attired. And Master Chief Davis, retired, would have testified to the same things to meet rebut and defeat the surprise of this unnoticed expert testimony. This prejudiced my client's substantial rights because these were the only on-the-ground witnesses in Beirut in the 80s to testify about these matters. All right. Thank you, ma'am. So are you reserved? Thank you, Your Honor. The government. Mr. Rundberg. Yes, Your Honor. May it please the court. First, I'd like to take in the same order that counsel did, if it's okay with the court. First, in regard to the sufficiency of the evidence for count two, I dispute what counsel said. The defendant did check both boxes on Government Exhibit 14, his naturalization form, both under the five-year residency as well as married and living together with his wife. He was previously put on notice by Mr. Holman and Attorney Blakely during his attempt from 2005 to 2008 to gain naturalization. I believe that is when his then-wife, Ms. Alouche, helped him with his naturalization form, not the one in 2009 that he is charged with, since, in fact, at that point, they were in the process of going for divorce. The petition for divorce was filed in 2007. The defendant filed his counterpetition in December of 2008, where he stated he was not living with his — that they were not living as husband and wife for over a year, which was — Well, counsel, regardless of what block was checked on the form, isn't it the Government's obligation to prove he was not entitled to naturalization under any statutory authority? Because that's what the indictment said. Well, I elaborated. I added something. It just says he's not entitled to naturalization. So it seems to me it's your burden, argument, regardless of on what basis he applied. Your Honor, we do have to prove that. And we did prove that. And here's why I believe we did. He was charged with lying about living with his wife on the naturalization form. He was naturalized according to the 319 naturalization. In regard to him not being eligible, he checked the box that he was living with him. He lied under oath to Mr. Schaffer. Is this the argument about not being a good moral character? Yes, Your Honor. Well, why can we independently or you independently decide that's the basis without giving that to the jury? I mean, we are having to decide as a matter of law, I suppose, that he wasn't entitled because he's a liar. Why isn't that a jury question? Because what the jury did decide, Your Honor, and found it beyond a reasonable doubt that, one, he did lie about living with his wife, that he was not entitled to have his citizenship according to that which was the only citizenship he was granted, and, two, he knew he lied about it. These were in the instructions. The court followed the instructions that this court set out in the Moses case. And in this, we know he lied because had he not, he checked the box for the 319 for the married and living together citizenship. If he was only going for the 316, he would not have had to have checked that box. But he did, and then he lied under oath to Mr. Schaefer about living with his wife, and he specifically asked him those questions. So he was shown beyond a reasonable doubt that he knew he wasn't entitled to the naturalization. The government in the indictment in Count I and Count II, 1425B, both, one, said not entitled because he was part of a terrorist organization. Count II says not entitled because he wasn't living with his wife, as the statute requires, the right length of time, that sort of thing. You're now adding, it seems to me, Count III with the new one, which is he was not entitled because he was a bad moral character. No, sir. I would respectfully disagree with that. He was charged in the indictment based on the only citizenship that he was granted was that he was married and living with his wife for more than three years. He was not entitled to it because he was not living with his wife for more than three years. He even admitted that in his divorce counterpetition that he had filed a year before. So he knew he wasn't entitled to that citizenship, yet he applied anyway, and yet he lied under oath to Mr. Schaefer about it. He knew that he was lying about it because he admitted it previously. He was not living with his wife. So the jury did not make a finding other than what the defendant was charged with. The reason counsel's argument about the other instruction is incorrect as well is that the instruction that defendant proposed only included her theory that the 470 allowed for citizenship under 316. All three of the CIS witnesses, Mr. Schaefer, Mr. Velasquez, Mr. Holman, all testified that their understanding was clear that the 470 form only protected the lawful permanent residence status. It did nothing to preserve the physical residency status. That was their understanding. Ms. Orr had raised it. We had gone over it with them pretrial, and they insisted that's what it was and that's what they testified to. So even assuming argument, they were completely wrong about it, which we believe they were correct. He wasn't eligible under 316, and the instruction was incorrect, and that while it mentioned their theory about the 470 form, it did not mention the rest of the requirement to have the 316 citizenship, and that would have had to have included the requirement for the good moral character under 1101F6. Under the statute for 316, it's section 1427, requires any individual to be a person of good moral character to be eligible for naturalization, and 1101F6 in the definition says no person shall be regarded or found to be of good moral character if they have lied under oath to gain an immigration benefit. The Supreme Court in Bereni versus INS stated that a defendant is not entitled to naturalization under 316 if they've lied under oath to gain immigration benefits because they are not of good moral character, and again said so in Cungas versus the United States, where there the defendant lied about his date of birth and his place of birth, and the Supreme Court held that even if the lies themselves may not be material, it shows that they're not of good moral character and therefore they're not eligible. By not having that extra requirement in the proposed instruction, the proposed instruction was incorrect and therefore not giving it was harmless error. What the court instructed the jury on is the elements this court set forth in the Moses case, including the definitions of what married or living in a marital union was. The court properly charged the jury, and we did show that he only got his citizenship by being married and living to his wife. The jury found beyond a reasonable doubt, and the evidence was replete. His defendant's own statements showed that he knew he wasn't married and living with his wife, so he was not entitled to any type of immigration status. So we believe that the government did show, when looking at the evidence in light most favorable to the government as the verdict winner, that the defendant was proven guilty beyond a reasonable doubt, that he applied for 319 naturalization, he was not entitled to it, and that he knew he was not entitled to it based on his own admissions previously, and that any error not giving the instruction, which was incomplete and misleading, was a harmless error. In regard to the constructive amendment argument, the government did nothing to constructively amend the indictment throughout the entire trial except for a very brief response to a defense witness comment about the defendant only carrying water. The government's entire evidence, its arguments, and its rebuttal, all focused on the defendant was a fighter with the Amal militia, an eventual commander with them, and at the later stages had command authority over a Hezbollah unit in his sector. The testimony of Jennifer Lushtanko about the defendant telling about his time with the Amal, the photographs that he showed, how proud he was to be an Amal fighter, the testimony of Mr. Reisenleiter and Mr. Snyder about how the defendant told them how he fought against the Israelis and then showed them videos of how he blew up Israeli personnel, the bullet hole in his arm and him telling a doctor showing the medical records that it was from a bullet hole, his statements to his family members about him being a POW with Israel and the abuse that he suffered as a POW, and the statements he made to the undercover agent. All go was what the government focused on. There was a very brief remark in response to a defense witness comment that the defendant was just a water boy. Nothing prevented the defendant from arguing that that's all he was or just delivering water wasn't sufficient to show that he materialized. But the defense doesn't get to create a straw man argument that he's just a water boy and claim that we don't get to respond and that somehow it's a constructive amendment. The court instructed the jury as using the pattern instruction for similar acts. The government never changed its proof. It's never changed its theory. The proof supported the indictment that was brought. The court correctly instructed the jury using the Fifth Circuit pattern instruction for 1001. Also told the jury that each element has to be found beyond a reasonable doubt. There was no constructive amendment and there was no variance as well. Was there any objection to the pattern charge? No, sir, there was not. For the 1001, no, sir. The government proved each and every element beyond a reasonable doubt that the defendant only made materially false statements to the Department of Defense on his security clearance form when he said he never participated with the Amal militia. In regard to the claim of constructive amendment on the court's response to the jury question, again, a constructive amendment occurs when the evidence presented in a trial proves a different crime than the one charged in the indictment or when the jury instructions broaden the scope. In the closing charge, again, the court instructed, pursuant to the pattern instruction for 1001 that the Fifth Circuit is handed down. The court sent the indictment back with the jury and reiterated it in the closing instruction that the government must prove the defendant guilty beyond or guilty of the crime charged and only of the crime charged. After the court received a confusing note, the court instructed the jury to follow the Fifth Circuit pattern instructions as given, and especially the jury should determine the government met the elements of the offense beyond a reasonable doubt. The court did not earn its jury instruction. There was no constructive amendment. And regarding the testimony of Mr. Holman, Mr. Holman didn't give expert testimony. He gave factual testimony based on his time and how it related to whether or not this would affect his naturalization form. Defense counsel, before Mr. Holman testified, asked both Jennifer Lushtanko and Philip Reisenleiter questions about the weaponry the defendant was holding in the photographs, the firing positions, what a fatal funnel was, whether or not the safety cap was on the rocket-propelled grenade. Mr. Holman was shown the photographs in regard to how this would affect his decision on naturalization. The court did not abuse its discretion by allowing this testimony. Further, the defendant has failed to set forth how the admission of Mr. Holman's testimony as related to his eligibility for citizenship substantially prejudiced the defendant's rights to a fair trial, given that the defendant elicited similar testimony both before from government witnesses and substantial testimony from defense witnesses in the same fashion. At least three different ones, Mr. Holman, Mr. Gazzone, and Nabil Allouche, about the defendant's ability and inability to use firearms if the photographs were posed, the current operability of the firearms, and their firing positions. Other than that initial objection with the defendant challenged Mr. Holman's testimony, being even shown the photograph and objecting to it being expert testimony, there was no other photographs lodged. There were no other objections lodged regarding Mr. Holman's testimony. In this case, the testimony was cumulative to other testimony that the defendant brought up both before and after. Why did you put him on? We put him on actually to put knowledge on him about the initial application for citizenship, because he was the one who dealt with the 2005 to 2008 one and actually tried to help the defendant gain citizenship first through 319, and then when they couldn't get him through 319, converted it to a 316 to 5 year, and tried to get him to stay, and when the defendant told them that he was going to take the job, they kept saying you need to wait. If you leave, you're not going to be able to get 316 citizenship. So he was the first one there. So we were putting that on to show his knowledge that he was put on notice about the requirement that he had to be living with his wife for three years and also why he wasn't eligible for the 316. Since the defendant had already raised this issue with the previous two witnesses, we decided to ask him how are these photos going to relate to how is this going to affect his citizenship, because count one did relate to him lying about being a member of a terrorist organization. The principal utility was not cumulative. It was as to the matters you just described. It's only as to the latter matter, the objective, that it was cumulative, arguably cumulative. Yes, sir. It was only cumulative as to the weaponry itself. It was not cumulative as to how it affected his citizenship application. I believe him and I think maybe Mr. Schaffer also testified to that somehow. Had he seen the photographs and known about their moral connection, would that have affected his citizenship? In regard to not allowing the ex-Navy SEAL and CIA contractor to testify, this is a completely different issue than what happened. The reason the SEAL wasn't allowed to testify is because the defendants willful failure to comply with the SEPA regulations. In June 2013, the defendant filed a motion to declare the case complex, stating that the defendant was aware they had, if they wanted to use classified information, that they would have to disclose it under SEPA. In a hearing on April 17, 2014, some 10 months before trial, the defendant refused to turn over classified information when the government requested it and other reciprocal discovery out of concern that it would undermine the defendant's case and allow the government to change its strategy. The quote for what counsel said is on page 73 of my brief and on page 2518 of the government record. It was clear that the defense was making a choice not to turn over the classified information as required by SEPA. The reason this notice requirement is required under SEPA Section 5A is to prevent unauthorized disclosure of classified information and to allow the government not to be surprised by inappropriate disclosure and use of classified information. Section B specifically provides for the remedy of preclusion if the defendant fails to comply with this. The government, after the defendant made these statements in open court, filed not one but two motions to compel under SEPA. The SEPA notice does, well, excuse me, both reciprocal discovery and the SEPA discovery requirement are required because there can't be surprise when it comes to classified information. In the North case, the defendant cited where, I'm running out of time, I'm going to skip. Despite making these requests in open court and filing two motions to compel, the defense attorney refused to let the government know of this information. Despite knowing that this witness was going to be testifying months beforehand, the defendant didn't even tell the courtroom information security officer who was assigned to the case to review classified information. We were not given the notice that was required under SEPA, and this was done because the defendant wanted to surprise us, wanted to show her wonderful evidence to the jury. But on its face, the proffer, all the information this witness was going to put on was classified. When did this come up during the defense case? Is that when this came up? Four days into trial, Judge, was when we heard the proffer, when they wanted to put the witness on. As Judge Lamberth pointed out, this is why we have early discovery in SEPA. This is why it's required, and when he refused to allow it, he said this is what SEPA is all about. Did the defense respond that they had only just learned of the witness? What was the response? Oh, no. Defense counsel, not this defense, Mr. Griffith, said that they had known months before they were going to call him. We were never given notice, and therefore they did not comply with SEPA. Anything this witness had from that time on its face was classified. These are special operations unit, and the court did not abuse its discretion by determining that this witness couldn't testify for a willful failure to comply with SEPA. All right. Thank you, sir. Back to you, Ms. Orr. Thank you. With regard to . . . Go to where you want to go. Why don't you tell me why I was on this last point about the witness. Is that correct? No, it's not correct. I don't know about you personally, but your side knew about the witness? Well, when did you know about this? We had SEPA litigation early in the case about my client's conduct of activity in Iraq, not the Lebanon information back in the 80s. And the CISO determined that none of the information was classified. When I spoke about not wanting to disclose SEPA at a pretrial hearing, I expressly said I don't want to disclose what's in my client's head. I didn't know if I was going to call my client to testify or not, and I make that point at 2536 of the record. It wasn't until they called Holman for this on-the-ground in Beirut testimony in the 80s that I was aware that I would then call Mr. Davis, Master Chief Davis, retired for the purpose of rebutting that surprise expert witness testimony. The government said in its brief, not that I'm trying to show, that this N-400 form, the answers would have affected him. I want you to take the whole five minutes. Rebuttal on that one question. I just wanted to know when did you know it, did you know it beforehand, and, you know, why it was raised. I knew it when Mr. Holman was called. I knew he was going to be a witness and advised the government two weeks before trial that Mr. Davis would be a witness and that it concerned information. So what's the abuse of discretion of the district court? I mean, I see two different versions of it from you and the government. My short question, for a short answer, is what's the abuse of discretion you would point out to us by the district court not allowing you to put the witness on? Chief Judge Stewart, it's that the government used him not for the purpose of showing materiality, but in its brief at page 69 and 70. No, no, no. I'm talking about this last witness, the sealed part. Yes, Your Honor. That's all I'm trying to drill down. And I'm trying to respond to the court's answer by saying this is what I was trying to meet with that testimony that the court excluded, and that's why the court abused its discretion because I wasn't allowed to meet his testimony, rebut it, and defeat it with Mr. Davis's unclassified testimony about the very thing Mr. Holman testified to that I was trying to directly counter. So it clearly wasn't classified. And it said he gave factual testimony based on his direct knowledge of the firearms, garb, and tactics used by terrorist fighters in his 22 years of military experience, clearly calling him as an expert, as well as when he was preparing to deploy to Beirut. My witness would have been better. He did deploy to Beirut. And so, Your Honor, that is how the court abused its discretion, excluding Mr. Davis's non-CEPA testimony. Plus the government at the beginning of the case said we don't have any classified information in this court. The CISO found there was not classified information in this case and said we're under the ordinary discovery order the court found. And so since there was nothing classified and this was simply to meet the same information that Mr. Holman provided, it should have been allowed, and the court abused its discretion in disallowing that defense testimony. On count two, I would mean to make the point that in Exhibit 14, my client did on the electronic hash mark, the way he filled out this form by computer, only mark A, I've been a permanent resident of the United States for five years, and also disclosed in his original application and in the second one that his wife lived at Poseidon in San Antonio and that he was deployed to Iraq as an interpreter. As you recall, the government and I told you that they advised the immigration officials, I'm about to deploy, and they said, well, don't deploy. Then you won't be with your wife and you can't qualify under this marriage thing. So, of course, he applies under the five years the next time and in the next application also tells them I've deployed to Iraq and my wife lives at Poseidon, so he is disclosing that they're not living together, although they're still married. So this is truthful, and I'll call to the Court's attention the Moses case that Chief Justice Stewart sat on the panel, saying if this statement on the form is actually true, then we need to reverse this conviction and order a judgment of acquittal because the information on the form, which were the two charged, was truthful. And, Your Honor, I'll point out my client was not indicted for a moral character issue. The jury wasn't instructed on that. And in the two cases cited by the government, Munziel and Kingsie, these were not arguments based on what was charged in the indictment and submitted to the jury. In fact, Kingsie was a civil denaturalization case where there was no indictment involved. And I don't care what the understanding of the witness is. The law is that my client qualified under the law under 8 U.S.C. 1427 for citizenship. Thank you very much, Your Honor. All right. We can tell it was a fiercely fought case in the trial and appreciate the zeal of both sides, the briefing and argument, and we will take it under advisement and decide it. Thank you, counsel, for both sides. May I be excused? Yes, ma'am.